UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER JAMES BAILEY,

     Plaintiff,

v.

CITY OF HOWELL and LUKE LORENZ,

     Defendants.

Case No. 2:13-cv-14082
Honorable Laurie J. Michelson
Magistrate Judge Michael J. Hluchaniuk

---

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [29]**

---

     Following a traffic stop, City of Howell Police Officer Luke Lorenz asked Plaintiff Christopher Bailey if he would submit to a chemical test for alcohol intoxication. Bailey's immediate response was "Not until I speak to my attorney." Lorenz understood Bailey's statement as a refusal. This triggered the automatic suspension of Bailey's driver's license under Michigan law, a search warrant request for a sample of Bailey's blood, and a blood draw at a local hospital to test for alcohol. Bailey asserts that his request to speak to an attorney was not a refusal, especially given that less than a minute after his first response, he agreed to take the chemical test. So Bailey brought this lawsuit under 42 U.S.C. § 1983 alleging that Lorenz violated his constitutional rights by, among other things, submitting a false affidavit for a warrant to draw Bailey's blood, seizing his driver's license, and lying at a driver's license suspension hearing about whether he consented to the chemical test.

     The City of Howell and Lorenz have moved for summary judgment. The motion is fully briefed and the Court heard oral argument on February 9, 2015. For the reasons that follow, the Court GRANTS Defendants' motion.

## I.

### A.

For the most part, a video recording from two cameras mounted to Lorenz's police car (one looking forward over the hood, the other looking toward the back seat and through the rear window), along with audio supplied by microphones on both the car and Lorenz, provide the undisputed facts of Bailey's arrest and his response to Lorenz's chemical-test request. *See Kinlin v. Kline*, 749 F.3d 573, 576 (6th Cir. 2014); *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012). Where there are ambiguities in the video or elsewhere in the record, the Court resolves them in favor of the party not moving for summary judgment, here Bailey. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014).

Around 2:00 a.m. on September 25, 2011, Bailey left his ten-year high-school reunion at the Shark Club in Howell, Michigan. (*See* Bailey Dep. at 49; Pl.'s Resp. Ex. 5, Police Report at 1.) As Bailey exited the club's parking lot, he turned the wrong way down a divided highway. (*See* Bailey Dep. at 49–50; Lorenz Dep. at 23.) Bailey testified, "[U]pon pulling out, I immediately noticed the island median. Since I was already in the roadway, I felt it was not safe for me to back up so I went around it." (Bailey Dep. at 49–50.)

Defendant City of Howell Police Officer Luke Lorenz was in a nearby parking lot and observed Bailey turn the wrong direction onto the highway. (Lorenz Dep. at 23.) Bailey recalled, "upon going around [the island median], I saw Officer Lorenz pull out behind me." (Bailey Dep. at 50.) Lorenz, police lights on, followed Bailey for a brief period. (Lorenz Dep. at 23, 49; Video at 2:12 a.m.) Bailey soon pulled into a gas station, at which point Lorenz radioed Bailey's license-plate number to dispatch. (Video at 2:12 a.m.) About ten seconds later, a computerized voice informed Lorenz, "There is a message for you." (Video at 2:12.) Bailey maintains that only

2

at this point, after he had already pulled over, did Lorenz learn that his license plate tabs were

expired. (Bailey Dep. at 97.) Lorenz testified at his deposition that he could see the tabs were the

wrong color while in pursuit. (Lorenz Dep at 25–26.)

    Shortly after Bailey pulled over, Lorenz exited his vehicle and approached Bailey's car:

LORENZ: How you doing? You know why you're being stopped?

BAILEY: No.

L: Pulled out of Shark's Club going the wrong way on the one-way. [inaudible] oncoming traffic there.

B: Okay. I guess I didn't realize—I mean I know what you're saying, didn't realize that it's a divided highway.

L: [A]lso your driver's license — or, uh, your license plate is expired.

(Video at 2:13.) Lorenz inquired whether Bailey had insurance. (Video at 2:14.) Bailey did not.

(Video at 2:14; Bailey Dep. at 71.) Lorenz then asked Bailey, "How much you been drinking?"

(Video at 2:14.) Bailey responded that he had "one" drink, to which Lorenz replied, "You had

one? Just one? Because I can smell it pretty strong coming out of you." (Video at 2:14.) After

confirming that Bailey generally had no problems with his eyes, Lorenz gave Bailey a brief eye

or vision test and then went back to his police car. (Video at 2:15.)

    A few minutes later, Lorenz returned to Bailey's car and asked Bailey to exit his vehicle.

(Video at 2:18.) Lorenz informed Bailey that he intended to conduct a field sobriety test, with

Bailey responding, "I, I don't want to do a field sobriety." (Video at 2:18.) Lorenz: "You'd like

to go to jail then?" (Video at 2:18.) Bailey responded by raising his hands and dropping them in

something of an exasperated manner. (Video at 2:18.) Lorenz explained, "That's your options,

right now you're driving with this uninsured vehicle. I can just take you to jail for that." (Video

at 2:19.) Bailey asked if he could "have a minute" to call someone. (Video at 2:19.) After a brief

3

back-and-forth on that query, Lorenz stated, "Okay. Your options right now are to do the sobriety and maybe go home or you can do it at jail. I'll leave it up to you. You wanna go to jail now or maybe go home tonight?" (Video at 2:19.) At which point, Bailey agreed to take the field sobriety test. (Video at 2:19.)

Lorenz conducted three sobriety tests. The first was an eye test: Lorenz moved his finger back and forth across Bailey's face approximately fifteen times for about a minute and observed Bailey for nystagmus. (*See* Video at 2:19–20; Police Report at 2.) Nystagmus describes "fast, uncontrollable movements of the eyes," which can be caused by excessive alcohol. MedlinePlus, *Nystagmus*, http://goo.gl/wCg1U (last visited Feb. 17, 2015). Lorenz's police report indicates that Bailey "had a lack of smooth pursuit in both eyes[,] . . . a distinct and sustained nystagmus at a maximum deviation in both eyes[,] . . . [and] the onset of nystagmus prior to forty five degrees in both eyes." (Police Report at 2.) Lorenz then had Bailey perform a walk-and-turn test, which Bailey passed. (Video at 2:21–22; Police Report at 2; Lorenz Dep. at 21.) Next, Bailey was instructed to stand on one leg while raising the other six inches off the ground in front of him until Lorenz told him to stop doing so. (Video at 2:22–24.) Bailey also passed this test. (Police Report 2; Lorenz Dep. at 21.)

Following the stand-on-one-leg test, Lorenz asked Bailey when he had his last drink. (Video at 2:24.) Bailey answered, "I'd say a half hour ago." (Video at 2:24.) He also equivocated from his prior answer about the amount he had to drink: "Maybe, maybe I had a drink-and-a-half." (Video at 2:24.)

Lorenz then attempted to get Bailey to take a preliminary breath test. (Video at 2:24.) He read Bailey his preliminary-breath-test rights, including that Bailey had the right to refuse the test and receive a civil penalty. (Video at 2:24.) Lorenz's script ended with, "I'm a peace officer

4

in the State of Michigan and I'm asking you to take a preliminary breath test. Are you willing to do that?" (Video at 2:24.) Bailey shook his head. (Video at 2:24.) At which point, Lorenz said, "Okay," handed his flashlight to an officer who had arrived at the scene during the nystagmus test, instructed Bailey to turn around, and reached for his handcuffs. (Video at 2:24.) This exchange then occurred:

> BAILEY: Alright fine, fine.
>
> LORENZ: So now you're willing to do it?
>
> B: What's my options?
>
> L: Do it, or go to jail.
>
> B: When I go to jail wha—then what?
>
> L: Well, based on what I've seen, I think I can arrest you for, uh, operating while intoxicated.
>
> B: Based on what?
>
> L: Based on what I've seen sir.
>
> B: Which is what?

(Video at 2:24–25.) Lorenz said, "Okay," reached for his cuffs, and approached Bailey. The two then talked over each other with Bailey stating, "No I'm asking, I'm asking, I'm asking," and Lorenz stating, "Alright. Are you going to take the test or not?" (Video at 2:25.) Bailey and Lorenz's exchange then continued:

> BAILEY: I'm asking, have I not done the test the way you asked?
>
> LORENZ: I've got training that you don't have sir.
>
> BAILEY: I'm asking though.
>
> LORENZ: Okay. I've got training that you don't have. Are you going to take the test or no?

BAILEY: No.

(Video at 2:25.) Lorenz handcuffed Bailey and placed him in the back of his squad car. (Video at 2:25–27.) About a minute later, the other officer on scene asked Lorenz, "Were his eyes all messed up?" Lorenz answered, "Yeah." (Video at 2:28.)

About ten minutes after his arrest, back in the squad car, Lorenz read Bailey his rights regarding a chemical test. (Video at 2:37–38.) Lorenz informed Bailey that he was under arrest for operating a vehicle while intoxicated and/or operating a vehicle while visibly impaired and that he was asking Bailey to submit to a "chemical test" for alcohol. (Video at 2:37–38); *see also* Mich. Comp. Laws § 257.625c (providing that vehicle operators (with certain exceptions) are deemed to have impliedly consented to a chemical test upon being arrested for, among other things, operating a vehicle while intoxicated). He advised that if Bailey refused the chemical test, the test would not be given without a court order, but that Lorenz might seek to obtain one. (Video at 2:37–38.) Lorenz told Bailey that his refusal to take the test "shall result" in the suspension of Bailey's operator's license and the addition of six points to his driving record. (Video at 2:38); *see also* Mich. Comp. Laws § 257.625a(6)(b)(v); Mich. Comp. Laws § 257.625g(1) (providing that if a person refuses a chemical test, "the peace officer who requested the person to submit to the test shall . . . [o]n behalf of the secretary of state, immediately confiscate the person's license or permit to operate a motor vehicle and, if the person is otherwise eligible for a license or permit, issue a temporary license or permit to the person."). Lorenz concluded his instructions with, "Will you take a breath test?" (Video at 2:38.) Bailey responded, "Not until I speak to my attorney." (Video at 2:38). After a twenty-second pause, this exchange then occurred:

BAILEY: That is—just to clarify that is neither a yes or no.

LORENZ: It counts as a no.

B: [Laughs.] Okay.

LORENZ ON RADIO: Send me the on-call judge information please.

B: Are you asking for a test right here or at the station?

L: I'm sorry, what?

B: Are you asking for a test here or at the station?

L: The test that I was offering you would have been administered at the jail, but now we're going to go to the hospital and do a blood draw.

B: Oh well then if it's at the ja—then that's fine. I didn't know—you didn't clarify what you were asking.

L: Nope, that's alright, we'll go to the hospital.

B: Sir, you didn't clarify what you were asking.

L: Sir, I read you exactly what I needed to read you. You said no.

B: [Laughs.]

L: So . . . that's alright. That just means you don't have a driver's license anymore. Fine with me.

B: Okay . . . well . . .

L: Fine with me.

B: We'll see. You didn't say where it was taken. So . . .

L: I don't have to tell you where it was taken.

B: Okay. We'll see.

L: Okay.

B: Is there, is there a video camera in this car?

L: Yep, there sure is.

B: Okay. Good, because I did not deny that I would not take it.

7

L: Your exact words to me . . . were—

B: I said I'd like to speak with my attorney.

L: —not until I speak with my attorney.

B: Does that say I wasn't going to? I don't think that's what I said.

L: Okay.

(Video at 2:38–41.) At his deposition, Bailey explained why he ultimately agreed to take the chemical test: "when [Lorenz] said that we were going to do a blood draw at the hospital and the test he was offering would have been the one administered at the jail, that was, to me, the lightbulb that went off that, you know, that this was not a [preliminary breath test]." (Bailey Dep. at 92.)

About ten minutes after Lorenz read Bailey his chemical-test rights, Lorenz drove Bailey to the hospital. (Video at 2:50.) Around 3:00 a.m., Lorenz spoke with Michigan District Court Judge Suzanne Geddis (by phone or radio) and swore to the warrant. (Video at 3:00; Bailey Dep. at 123.) Soon afterwards, a nurse took a sample of Bailey's blood. The test, taken about an hour after Bailey left the Shark Club, revealed a blood-alcohol level of 0.07. (Bailey Dep. at 40.) Michigan's legal limit is 0.08 (grams of alcohol per 100 milliliters). Mich. Comp. Laws § 257.625(1)(a).

As result of the night's events, Bailey was charged with operating while intoxicated, driving the wrong way on a divided highway, operating a vehicle without insurance, having expired license plate tabs, and refusing the preliminary breath test. (Bailey Dep. at 119–20; Defs.' Mot. Ex. 5, Plea Hr'g Tr. at 4–5.)

**B.**

About six weeks after Bailey's arrest, on November 9, 2011, Lorenz and Bailey testified before Michigan Secretary of State Hearing Officer Steve Brandy "for the purpose of determining whether [Bailey's] driver's license . . . should be suspended under the implied consent statute." (Pl.'s Resp. Ex. 28, Implied Consent Hr'g Tr. at 4.) The scope of the hearing was statutorily limited to four issues: whether Lorenz had reasonable grounds to believe that Bailey had committed one of the crimes listed in Michigan Compiled Laws § 257.625c(1), including driving while intoxicated, whether Lorenz arrested Bailey for one of those crimes, whether Lorenz advised Bailey of his chemical-test rights under § 257.625a(6), and whether Bailey unreasonably refused the chemical test. (Implied Consent Hr'g Tr. at 5). *See also* Mich. Comp. Laws § 257.625f(4). The video was not available at the hearing because, apparently, the prosecutor's office would not release the video until after it received Bailey's chemical-test results. (*See* Implied Consent Hr'g Tr. at 5.)

Three aspects of Lorenz's testimony are especially important to Bailey's claims.

First is Lorenz's explanation for stopping Bailey. Both on direct examination by the hearing officer and on cross-examination by Bailey's counsel, Lorenz testified that he stopped Bailey because Bailey had been driving the wrong way on the road *and* because Bailey had expired license-plate tabs. (Implied Consent Hr'g Tr. at 9–11.) On further cross examination by Bailey's counsel this exchange took place:

> [BAILEY'S COUNSEL:] Okay. Do you see any signs [in this photograph of the Shark Club exit] indicating that that's a one-way road?
>
> [LORENZ:] No, sir.
>
> Q. Okay. So as you look at that picture, it appears that it is just a two-lane road. And this is actually with lights. It's taken at night, the same time. Is there any indication that you need to turn right only coming out of that driveway?

9

A. I object to the question, 'cause I don't see how that refers to the four points that we're here for.

HEARING OFFICER: Okay.

[BAILEY'S COUNSEL]: Well, it would be a basis for the st[o]p, Your Honor.

[LORENZ]: But I already determined that his license plate was expired. That's the basis for the stop.

(Implied Consent Hr'g Tr. at 12.) Bailey claims that Lorenz's use of the word "the" indicates that he had only one reason for the stop, which he argues is both contrary to his earlier testimony indicating two reasons and false because Lorenz did not know the tabs were expired until after Bailey pulled over.

Second, Lorenz testified about Bailey's response to the chemical-test request. Upon examination by Hearing Officer Sandy, Lorenz testified:

Q. So Mr. Bailey was offered both the [preliminary breath test] and the regular breathalyzer, as well?

A. That's correct, sir.

Q. And he refused both?

A. He refused both.

Q. All right. Was there indication that he was unclear or unsure as to why he needed to take a second test?

A. No. When I completed reading him his chemical test rights, his only response was to my question on will he take a breath test was not 'til I speak to an attorney.

Q. Okay. And what did you respond to that?

A. I don't recall what my response to that was. He made no further requests to speak to attorney after that point.

(Implied Consent Hr'g Tr. at 19–20.) Bailey maintains that the video is contrary to the emphasized testimony. (Bailey Dep. at 107–10.)

10

Third, Lorenz testified about the search-warrant affidavit he signed in support of drawing Bailey's blood on the night of his arrest. Lorenz's affidavit stated, "D has strong odor of intoxicants coming from his person." (Pl.'s Resp. Ex. 4, Aff. & Warrant.) At the hearing, Bailey's counsel asked Lorenz about this statement: "When you refer to a strong odor of intoxicants, what did you smell?" (Implied Consent Hr'g Tr. at 14.) Lorenz testified, "It was a moderate odor of intoxicants. It was intoxicants." (*Id.*) Bailey focuses on Lorenz's inconsistent use of the adjectives "strong" and "moderate."

Based on the testimony, Hearing Officer Sandy found that

> Officer Lorenz had reasonable grounds to believe that Petitioner [Bailey] operated his vehicle under the influence of liquor, and that he arrested Petitioner for the offense of Operating While Intoxicated and advised him of the chemical test rights. The evidence is also sufficient to find that Petitioner refused the requested breath test, and that his refusal was unreasonable and in violation of the Implied Consent Law.

(Pl.'s Resp. Ex. 11, Implied Consent Order at 2.) He thus suspended Bailey's license for a year, beginning on December 9, 2011. (*Id.*) He advised Bailey, however, that he had the right to seek a rehearing after receiving the video and a right to appeal to circuit court. (Implied Consent Hr'g Tr. at 8; Implied Consent Order at 2.)

## C.

Bailey appealed and Hearing Officer Sandy held a rehearing about eight months after the first hearing, on July 20, 2012. (Pl.'s Rep. Ex. 12, 2d Driver License Appeal Order at 1.) The video footage from Lorenz's car had become available and was played at the rehearing. Hearing Officer Sandy concluded that

> the evidence is not sufficient to prove that Petitioner [Bailey] refused to submit to the requested breathalyzer test. While Petitioner initially declined the offered test, without minutes [*sic*] he changed his mind and agreed to comply with the implied consent law. Since Petitioner "cured" his initial refusal well before a search warrant was issued for a court ordered test, the test should have been given.

11

(2d Driver License Appeal Order at 2.)

**D.**

Meanwhile, Livingston County prosecuted the five charges against Bailey. In February 2012, Bailey reached a plea deal with the county prosecutor. (*See generally* Defs.' Mot. Ex. 5, Plea Hr'g Tr. at 4.) The prosecutor agreed to drop the charges of operating while intoxicated, driving on the wrong side of a divided highway, and refusal to take the preliminary breath test. (Plea Hr'g Tr. at 4.) In exchange, Bailey pled guilty to careless driving, having an expired license plate, and operating without insurance. (Plea Hr'g Tr. at 4–5.) Of those three charges, the first two were civil infractions, the third a misdemeanor. (Plea Hr'g Tr. at 4–5.)

**E.**

In September 2013, Bailey filed this lawsuit. According to Bailey, his Amended Complaint, despite its six numbered counts, sets forth ten claims. (*Compare* Pl.'s Resp. to Defs.' Mot. Summ. J. at 2–3, *with* Am. Compl. ¶¶ 53–105.)

In August 2014, Defendants Lorenz and the City of Howell moved for summary judgment on the entirety of Bailey's Amended Complaint. (*See generally* Dkt. 29, Defs.' Mot. Summ. J.)

**II.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-movant, here Bailey. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.

### A.

Before examining the merits of Bailey's claims, the Court addresses three potentially threshold issues raised by Defendants.

### 1.

Defendants assert that collateral estoppel bars Bailey's Fourth and Fourteenth Amendment claims. According to Defendants, because Bailey pled guilty to careless driving, lack of insurance, and expired license plate tabs, probable cause has been conclusively established. (*See* Defs.' Mot. at 5–6.)

Defendants' collateral-estoppel argument is not well taken as it fails to account for a prior ruling by the judge previously assigned to this case. In denying Defendants' prior dispositive motion, United States District Judge John Corbett O'Meara explained, "At most, Plaintiff's conviction provides probable cause for his traffic stop. Plaintiff did not plead guilty to operating a vehicle while intoxicated. . . . [T]he issue of driving while intoxicated was not previously litigated on the merits." *Bailey v. City of Howell*, No. 13-14082, 2014 WL 793693, at *3 (E.D. Mich. Feb. 27, 2014). "[F]indings made at one point in the litigation become the law of the case for subsequent stages of that same litigation," *see United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994), and Defendants have not shown that their present estoppel argument is any different than the one Judge O'Meara rejected.

To the contrary, as Judge O'Meara recognized, the vast majority of Bailey's claims under the Fourth and Fourteenth Amendments go beyond the traffic stop. In Count I, Bailey claims that Lorenz violated the Fourth Amendment by arresting him without probable cause. (Pl.'s Resp. at 2, ¶ 5b; *see also* Am. Compl. ¶¶ 55, 57.) In Count II, Bailey pleads that his driver's license was

seized without probable cause in violation of the Fourth Amendment. (Pl.'s Resp. at 2, ¶ 5c; Am. Compl. ¶¶ 61–62.) In Counts II and III, Bailey alleges that his body was searched and blood was seized in violation of the Fourth Amendment. (Pl.'s Resp. at 2, ¶¶ 5d, 5e; Am. Compl. ¶¶ 61–62, 70.) Count IV asserts that Lorenz violated Bailey's rights under the Due Process Clause of the Fourteenth Amendment by (1) preventing Bailey from taking the chemical test and (2) testifying falsely under oath at the first Secretary of State hearing. (Pl.'s Resp. at 2, ¶¶ 5f, g; Am. Compl. ¶¶ 76–80.) In Count V, Bailey asserts a malicious prosecution claim under the Fourth Amendment for Lorenz's pursuit of (1) the criminal charge of operating while intoxicated and (2) the administrative license suspension. (Pl.'s Resp. at 3, ¶¶ 5h, i; Am. Compl. ¶¶ 86, 91, 93, 95.) Each of these claims stem from Bailey's arrest for driving while intoxicated and Lorenz's belief that Bailey refused to take the chemical test. Defendants provide no explanation for how facts or issues established by convictions for careless driving and driving without insurance or current tabs are facts or issues underlying claims arising from an arrest for driving while intoxicated and the refusal to administer the chemical test. *See Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrecoverable Trust Dated June 27, 2002*, 410 F.3d 304, 310 (6th Cir. 2005) (providing that "the party asserting preclusion bears the burden of proof" and that, under Michigan law, collateral estoppel applies only if "the same issue was actually litigated in the first proceeding"); *People v. Gates*, 452 N.W.2d 627, 631 (Mich. 1990) (providing that collateral estoppel applies only where an issue was "essential" to the prior judgment and "the basis of the prior judgment can be ascertained clearly, definitely, and unequivocally.").

## 2.

Under *Heck v. Humphrey*, 512 U.S. 477 (1994),

in order to recover damages for . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that

14

the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Id.* at 486–87. Defendants argue that *Heck*'s delayed-accrual rule prevents Bailey from "challeng[ing] the validity or constitutionality of [his] arrest." (Defs.' Mot. at 7.)

Defendants again ignore Judge O'Meara's prior ruling in this case. He concluded that "Plaintiff's claims are not barred by *Heck*" and explained, "Plaintiff's action—in which he challenges his license suspension and blood draw—will not serve to invalidate the judgment against him for careless driving, expired tabs, and lack of insurance." *Bailey*, 2014 WL 793693, at *3. Defendants provide no reason for the Court to revisit this ruling, other than that the case was reassigned. *See Moored*, 38 F.3d at 1421. While courts have the authority to revisit their non-final orders, a mere case reassignment is not a sound legal basis for doing so.

**3.**

Lorenz asserts qualified immunity, but, given the manner in which he asserts it, the affirmative defense does not alter the standard Rule 56 analysis. Qualified immunity shields government officials from suits for money damages for their reasonable, discretionary actions. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Moldowan v. City of Warren*, 578 F.3d 351, 396 (6th Cir. 2009). The analysis is two pronged: (1) has the plaintiff shown that the official violated his constitutional rights? And (2) were those rights clearly established when the official acted? *See Pearson*, 555 U.S. at 232, 236. Here, Lorenz says only that Bailey "cannot establish a violation of any constitutional right." (Defs.' Mot. at 13.) As such, the Court tests only that assertion. But this is as if Lorenz had not raised the qualified immunity shield and simply argued that no reasonable jury could find that he violated Bailey's constitutional rights.

15

**B.**

In Count I, Bailey claims that Lorenz violated the Fourth Amendment by stopping him, and then arresting him, without probable cause. (Pl.'s Resp. at 2, ¶ 5b; *see also* Am. Compl. ¶¶ 55, 57.) Lorenz not only disagrees but says that no reasonable jury could find that he lacked probable cause to stop and then arrest Bailey. (Defs.' Mot. at 7–9.) The Court agrees with Lorenz.

**1.**

With respect to the traffic stop, "'Police may make an investigative stop of a vehicle when they have reasonable suspicion of an ongoing crime, whether it be a felony or misdemeanor, including drunk driving in jurisdictions where that is a criminal offense. . . .'" *United States v. Simpson*, 520 F.3d 531, 539 (6th Cir. 2008) (quoting *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004)). Police may also "make a stop when they have probable cause to believe a civil traffic violation has occurred." *Simpson*, 520 F.3d at 539 (quoting *Gaddis*, 364 F.3d at 771 n.6).[1]

Because the existence of probable-cause is highly fact-dependent, the standard does not lend itself to a precise definition. Still, "the substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Kinlin v. Kline*, 749 F.3d 573, 578 (6th Cir. 2014) (internal citation and quotation marks omitted). And, "[f]or probable cause to arrest to exist, the facts and circumstances within the officer's knowledge must be sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect

---

[1] Whether police may stop a vehicle based on mere "reasonable suspicion" of a traffic violation is the subject of tension in our Court of Appeals' precedents. *See Simpson*, 520 F.3d at 539. The Court need not and does not attempt to address the issue, as any reasonable jury would find the higher, probable-cause standard satisfied on the record before the Court.

16

has committed, is committing or is about to commit an offense." *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (internal quotation marks and alterations omitted). Although "the existence of probable cause in a § 1983 action presents a jury question," *Kinlin*, 749 F.3d at 578, if the record permits all reasonable juries to reach only one conclusion, the Court answers the inquiry on a motion for summary judgment, *Thacker*, 328 F.3d at 255.

Bailey's argument that a reasonable jury could infer that Lorenz lacked probable cause for the traffic stop is as follows. (*See* Pl.'s Resp. at 24–25.) At the first administrative hearing, Lorenz testified that "the" basis for the stop was that Bailey had expired license plate tabs. Then, according to Bailey, at the second administrative hearing, Lorenz testified that he could not see whether Bailey's license plate tabs were expired during the pursuit and did not learn their expired status from dispatch or his computer system until after Bailey pulled over. Bailey thus concludes that a jury could infer that Lorenz lacked probable cause for the traffic stop.

Bailey's argument ignores key, undisputed facts. For one, Lorenz saw Bailey leave the Shark Club at 2:00 a.m. For another, Lorenz saw Bailey head the wrong way on a divided highway. Indeed, video from Lorenz's vehicle shows that his police lights were on *before* he read Bailey's license plate over the radio. (*See* Video at 2:12:12–2:12:29.) Although Bailey relies on Lorenz's administrative-hearing statement that "the" basis for the stop was Bailey's expired tabs, Bailey ignores that at the very same hearing Lorenz twice stated that a basis for stopping Bailey was that he was driving the wrong way on the highway. In accord with this testimony, the video shows that after approaching Bailey's car, Lorenz first told Bailey that he had been stopped because he "[p]ulled out of Shark's Club going the wrong way on the one-way. [inaudible] oncoming traffic there." (Video at 2:13.) Only after that statement did Lorenz add

17

that he had stopped Bailey for expired license plate tabs (Video at 2:13)—which was also a perfectly legitimate reason for a traffic stop.

With the completed factual picture, no reasonable jury could find that Lorenz lacked probable cause to stop Bailey.

## 2.

The undisputed record also supports that Lorenz had probable cause to arrest Bailey. In addition to the facts supporting the traffic stop, Lorenz had other good reasons to think that Bailey had driven while intoxicated. Bailey had failed the nystagmus test. Lorenz smelled alcohol coming from Bailey.

Bailey's attempts to create a jury question are unavailing. Regarding Lorenz's finding of nystagmus, Bailey says that Lorenz was "unqualified" to diagnose that condition and that nystagmus has "many causes." (Pl.'s Resp. at 15 n.3.) But, as to the latter, the video reflects that Lorenz confirmed that Bailey generally had no eye problems. As to the former, Bailey has produced insufficient evidence that Lorenz was untrained to observe nystagmus. True, he has produced a Howell Police Department document setting forth "Arrest Procedures – OWI/OUID & Zero Tolerance" that does not include nystagmus among the listed psychophysical tests. (Pl.'s Resp. Ex. 23 at 2.) But the record also reflects that the standardized Howell Police Department form completed by Lorenz includes a section specifically pertaining to a "horizontal gaze nystagmus" test. (Pl.'s Resp. Ex. 5.) And, although equivocal, Lorenz implied during his deposition that he had been trained to perform that test. (*See* Lorenz Dep. at 6.)

Bailey also believes a jury could find that Lorenz did not in fact smell intoxicants. He points to inconsistencies between Lorenz's use of the adjective "moderate" and "strong." Lorenz's police report provides, "I could . . . smell moderate odor of intoxicants coming from the

inside of Bailey's vehicle." (Pl.'s Resp. Ex. 5.) But in his warrant affidavit, Lorenz wrote, "D has strong odor of intoxicants coming from his person." (Pl.'s Resp. Ex. 4.) Then, at the first administrative hearing, Lorenz testified, "It was a moderate odor of intoxicants. It was intoxicants." (Driver License Appeal Hr'g Tr. at 14.) Bailey asserts: "Lack of consistency does not show that Plaintiff definitely had an odor of intoxicants, it shows that he likely did not have *any* odor." (Pl.'s Resp. at 22.)

No reasonable jury would agree. That Lorenz used different adjectives on different occasions to describe the extent to which Bailey smelled of intoxicants does not permit the reasonable inference that Lorenz entirely fabricated that Bailey smelled of intoxicants. Indeed, the police video reflects that soon after Lorenz first approached Bailey, Lorenz stated, "I can smell it pretty strong coming out of you." (Video at 2:14.) Bailey provides no basis for a jury to find that Lorenz—at that moment—was motivated to lie. Moreover, at his deposition, Lorenz explained his use of different adjectives:

> The police report says I could smell a moderate odor of intoxicants coming from inside of Bailey's vehicle. As I was outside of the vehicle talking to him, we weren't face-to-face per se, there was a window dividing, he was inside his car, so that the odor at that time was moderate. . . . The search warrant says that he has a strong odor of intoxicants coming from his person. And that's because when we were talking face-to-face outside of his car and also when he was in the backseat of my car, I could smell a strong odor of intoxicants coming from his person.

(Lorenz Dep. at 46.) In all, whether Bailey smelled of intoxicants does not present a question requiring a jury's resolution.

Although Bailey relies heavily on the fact that he passed the two balance tests and that the video does not show that he was off balance, the probable-cause-to-arrest inquiry requires an examination of the totality of the circumstances. Bailey left a club at 2:00 in the morning, drove the wrong way on a highway, smelled of intoxicants, tested positive for nystagmus, and refused

to take the preliminary breath test. This is sufficient to establish probable cause even if Bailey was never off balance on the night of his arrest. The probable cause standard does not demand certainty beyond a reasonable doubt or even beyond a preponderance. *See United States v. Terry*, 522 F.3d 645, 650 (6th Cir. 2008) ("[A] probable cause finding does not require a preponderance of the evidence[.]"); *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) ("Probable cause . . . does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime."); *cf. Illinois v. Gates*, 462 U.S. 213, 235 (1983) ("While an effort to fix some general, numerically precise degree of certainty corresponding to probable cause may not be helpful, it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." (internal quotation marks omitted)). Given the totality of the evidence known to Lorenz and the standard that the known evidence had to meet, no reasonable jury would find that Lorenz lacked probable cause to arrest Bailey for operating while intoxicated.

## C.

In Counts II and III, Bailey pleads that his body was searched (when his blood was drawn) and his blood seized in violation of the Fourth Amendment because Lorenz's affidavit leading to the issuance of a warrant was "fraudulent." (*See* Pl.'s Resp. at 2, ¶¶ 5d, 5e; Am. Compl. ¶¶ 61–62, 70.) Bailey asserts that Lorenz's warrant affidavit (1) falsely claimed that Bailey was off balance when in fact he was not, (2) omitted the exculpatory fact that he passed the walk-and-turn test, (3) omitted the exculpatory fact that he passed the stand-on-one-leg test, (4) omitted the exculpatory fact that, after seeking clarification, he consented to the chemical test, and (5) falsely claimed that he had a "strong" odor of intoxicants when in fact it was at worst moderate. (*See* Pl.'s Resp. at 16–17, 23.) For good measure, Bailey adds that "[g]iven how

20

often Lorenz has impeached himself, it is highly likely there was no odor of intoxicants and Plaintiff did not have nystagmus." (Pl.'s Resp. at 23.)

Lorenz implies that because the blood draw followed a lawful arrest, it was necessarily a reasonable search and seizure under the Fourth Amendment. This is not accurate. *See Missouri v. McNeely*, --- U.S. ---, 133 S. Ct. 1552, 1558, 185 L. Ed. 2d 696 (2013) ("Noting that '[s]earch warrants are ordinarily required for searches of dwellings,' we reasoned [in *Schmerber v. California*, 384 U.S. 757, 770 (1966),] that 'absent an emergency, no less could be required where intrusions into the human body are concerned,' even when the search [a blood draw] was conducted following a lawful arrest.").

The correct framework is the one Bailey invokes. (Pl.'s Resp. at 28.) Because the search and seizure was pursuant to a warrant approved by a judge, in order to prevail on his § 1983 claim, Bailey must show that Lorenz "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000))); *see also Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989). But even if "the affidavit contains false statements or material omissions," no relief under § 1983 is warranted if, having been stripped of its false statements and supplemented with material omissions, the affidavit is sufficient to establish probable cause. *Sykes*, 625 F.3d at 305. Although this determination is one for the jury, *Hill*, 884 F.2d at 276, where a reasonable jury could only answer in one way, the Court may make the probable-cause determination on a motion for summary judgment, *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005).

The Court's analysis starts and ends with the second prong. Once corrected, any reasonable jury would conclude that the affidavit suffices to establish probable cause. In Bailey's favor, a reasonable jury could find, based on the video, that he was not off balance during the stop. Additionally, a reasonable jury could find that Lorenz should have included the following in the affidavit: that Bailey passed the walk-and-turn and stand-on-one-leg tests and ultimately consented to a chemical test. On the other hand, the Court has found that a reasonable jury could not find that Lorenz was unable to properly identify nystagmus or that he fabricated that Bailey smelled of alcohol. And, to the extent that it was material that Lorenz omitted that Bailey passed the balance tests, it was also material to omit that after leaving a club at 2:00 in the morning, Bailey went the wrong way on a highway. In all, these findings result in this "corrected" affidavit:

> Suspect exited Shark Club at 2:00 in the morning and headed the wrong direction on highway. Suspect had nystagmus in both eyes and smelled of alcohol. Suspect passed the walk-and-turn and stand-on-one-leg tests. Suspect refused preliminary breath test. After arrest, suspect at first stated that he would not take a chemical test until he spoke with his attorney, but, upon learning that the test would be at the jail, agreed to the chemical test.

No reasonable jury could think that an affidavit like this one did not establish probable cause for a warrant to draw Bailey's blood for alcohol testing. Despite that Bailey passed some field sobriety tests, an objective, neutral judge would have undoubtedly found significant that he failed the nystagmus test, smelled of alcohol, and drove the wrong way on a highway after exiting a club at 2:00 in the morning. Moreover, Bailey both refused the preliminary breath test and demonstrated some reluctance toward the chemical test. A judge would likely infer that Bailey was not confident in his ability to pass these tests or was stalling to create more time before taking them. Finally, as stated, the probable-cause bar is not high. *Terry*, 522 F.3d at 650; *Mounts*, 248 F.3d at 715. In all then, Bailey's claim that Lorenz violated the Fourth Amendment

by submitting a false affidavit for the search of Bailey's body and seizure of his blood fails to present a question for the jury.

Bailey resists this conclusion by asserting that, under Michigan law, "[i]f a person consents to taking a chemical test, an officer may not obtain a warrant to search blood." (Pl.'s Resp. at 28; *see also* Pl.'s Resp. at 31 ("A search warrant cannot be obtained to search a driver's blood unless a person refuses the chemical test. MCL 257.625a(6)(B)(iv).").) But the statutory provision Bailey relies upon does not say that. It says, "A person arrested for a crime described in section 625c(1) shall be advised of all of the following: (*i*) If he or she takes a chemical test of his or her blood, urine, or breath administered at the request of a peace officer, he or she has the right to demand that a person of his or her own choosing administer 1 of the chemical tests. . . . (*iv*) If he or she refuses the request of a peace officer to take a test described in subparagraph (*i*), a test shall not be given without a court order, but the peace officer may seek to obtain a court order." Mich. Comp. Laws § 257.625a(6)(b)(i), (vi). In other words, this statutory provision says what occurs "if" there is a refusal (the officer must obtain a warrant)—it does not say that the officer is precluded from obtaining a warrant if there is no refusal.

Accordingly, Bailey's illegal search and seizure claims based on the blood draw fail as a matter of law.

### D.

Bailey also brings a malicious prosecution claim under the Fourth Amendment. (*See* Pl.'s Resp. at 3, ¶¶ 5h, i; Am. Compl. ¶¶ 86, 91, 93, 95, Count V.) ("Malicious prosecution" is a bit of a misnomer for the constitutional claim, and unreasonable prosecutorial seizure a better name, because, in contrast to the common law claim of malicious prosecution, the Fourth Amendment variety does not involve intent. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010).) Bailey

asserts that Lorenz participated in or influenced the decision to prosecute him for operating while intoxicated even though Lorenz lacked probable cause for believing that a crime had occurred. (Pl.'s Resp. at 33.) Bailey asserts that "Lorenz doesn't know the basis for his stop, he doesn't know the odor of intoxicants, he doesn't know when or if Plaintiff was even off-balance. What he did know at the time was Plaintiff passed all of the physical aspects of the [standard field sobriety tests] and there was no blood alcohol reading." (Pl.'s Resp. at 33.) Bailey also asserts a Fourth Amendment violation for Lorenz's participation in the administrative proceedings that led to his license suspension for eight months. (Pl.'s Resp. at 33–34.) According to Bailey, Lorenz "made sure the suspension stood when he falsely testified at the hearing that Plaintiff never consented to take the chemical test." (Pl.'s Rep. at 34.) Lorenz responds that Bailey's Fourth Amendment claims fail because he had probable cause to stop Bailey and arrest him. (Defs.' Mot. at 15–16.) The Court finds that no reasonable jury could find for Bailey on his unreasonable-prosecutorial-seizure claim.

To establish a claim of unreasonable prosecutorial seizure under the Fourth Amendment, a plaintiff must show, among other things, that there "was a lack of probable cause for the criminal prosecution." *Sykes*, 625 F.3d at 308. The Court has already explained that there was probable cause for Bailey's arrest for driving while intoxicated. With no significant exculpatory evidence discovered between the time of arrest and the time of his prosecution (to the contrary, Bailey's blood-alcohol level tested at .07), it follows that there was probable cause to prosecute him for that crime. Bailey's claim thus fails to the extent it is based on Lorenz's participation in his criminal prosecution.

It also fails when premised on Lorenz's participation in the administrative license-suspension proceedings (assuming that such a proceeding even implicates the Fourth

24

Amendment). As Lorenz has moved for summary judgment, the Court must accept Bailey's version of the facts and draw reasonable inferences from the facts in his favor. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). Under this standard, a reasonable jury could find that Bailey initially refused the chemical test but then revoked his refusal without any material change in circumstances. But it does not follow that a reasonable jury could further find that Lorenz lacked *probable cause* to believe that Bailey had refused to take the test. Lorenz testified that he was trained to treat Bailey's first response as his final answer. (Lorenz Dep. at 35, 38; *but see* Lorenz Dep. at 39 (acknowledging that an arrestee's question about where the chemical test would be administered would not be construed as a refusal).) And, as explained, the probable cause bar is not high. *See Terry*, 522 F.3d at 650; *Mounts*, 248 F.3d at 715. Although Hearing Officer Sandy ultimately concluded that Bailey "'cured' his initial refusal," this does not mean that Lorenz lacked an objectively reasonable basis for thinking otherwise. The Court believes that any reasonable jury would agree that Lorenz's interpretation of Bailey's answer as a refusal, even if incorrect, was objectively reasonable. Lorenz thus had probable cause to believe that Bailey had refused the chemical test he was offered.

Although raised in a different part of his brief, Bailey resists this result by arguing that *Hall v. Sec'y of State*, 231 N.W.2d 396 (Mich. Ct. App. 1975), "held [that] a person requesting to speak with an attorney is a reasonable refusal" of a chemical test such that a license suspension under Michigan's implied-consent statute is unwarranted. (Pl.'s Resp. at 27.) But *Hall* did not hold that a request to speak to an attorney was not a refusal—only that the refusal was reasonable. *See Hall*, 231 N.W.2d at 397, 399–400. Additionally, *Hall*'s holding is not so broad. It is true that the Michigan Court of Appeals found that Wayne Hall's request to call his attorney prior to taking a chemical test for intoxication amounted to a reasonable refusal under

25

Michigan's implied-consent statute and, therefore, Hall's license should not have been suspended. 231 N.W.2d at 399. But the Michigan Court of Appeals did not set forth a rule blanketing all such requests. As the Michigan Court of Appeals has much more recently explained, it depends on the circumstances:

> In *Hall*, . . . we held that an arresting officer's refusal "to permit plaintiff to make a phone call appears to be arbitrary," because it was the "policy of the department to refuse prisoners a telephone call unless and until they signed a booking card." We found the procedure at issue "coercive rather than an attempt to expedite the test." . . . Given the circumstances of the arrest and detainment, we held the plaintiff's refusal [to submit to a chemical test] reasonable. . . . Our analysis centered on "reasonableness," which was and remains a factual determination, and did not establish a legal presumption that overrides other factual considerations. . . .
>
> In sum, the totality of the circumstances dictate whether a request to contact counsel provided a reasonable basis to refuse a chemical test.

*People v. Bradford*, No. 257343, 2005 WL 3536427, at *2 (Mich. Ct. App. Dec. 27, 2005) (internal citations omitted). Here, the totality of the circumstances are those reflected in the "corrected" affidavit set forth in Part III.C. On those facts, Lorenz reasonably concluded that Bailey's refusal to take the chemical test until he spoke with his attorney was primarily to delay testing. This is a far cry from the facts of *Hall*: "Was appellant's refusal [of the chemical test] unreasonable? It does not seem to us unreasonable for a person to refuse to succumb to the wishes of a police officer employing an arbitrary device[, i.e., refusing a telephone call until a booking card was signed,] to 'persuade' [plaintiff] to cooperate. . . . The state is hardly in a position to complain of plaintiff's negative response to the officer's draconian tactics." *Id.* at 441.

Bailey's unreasonable prosecutorial seizure claim under the Fourth Amendment thus fails as a matter of law.

26

**E.**

In Count VI, Bailey claims that Lorenz violated his rights under the Due Process Clause of the Fourteenth Amendment. In particular, Bailey asserts the following unconstitutional conduct: Lorenz submitted a form used to report chemical-test refusals to the Secretary of State (when, in fact, Bailey had not refused the chemical test); Lorenz implied, by swearing to a search warrant, that Bailey had refused the chemical test (when, in fact, he had not); and Lorenz testified falsely at the first implied-consent hearing. (Am. Compl. ¶¶ 76–80; Pl.'s Resp. at 2, ¶¶ 5f, g.)

In his brief, Lorenz, relying on only *Graham v. Connor*, 490 U.S. 386 (1989), argues that these claims are not cognizable under the Due Process Clause because they are the exclusive domain of the Fourth Amendment. (*See* Defs.' Mot. at 14.)

At least regarding Lorenz's alleged false testimony, the Court is not persuaded. *Graham* involved a Fourth Amendment claim based on excessive force, and held that "all claims" that law enforcement officers have used excessive force in seizing "a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395. Following *Graham*, the Sixth Circuit has provided that the Fourth Amendment "bars excessive force against free citizens," the Eighth Amendment "bars excessive force against convicted persons," and "when a citizen does not fall clearly within either category—e.g., pretrial detainees—the Fourteenth Amendment's more generally applicable Due Process Clause governs to bar a governmental official's excessive use of force." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013); *see also Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006) (providing that "the subset of malicious prosecution claims which allege continued detention without probable cause must be pursued and analyzed under the

Fourth Amendment"). But the Court does not read these cases as barring claims brought under the Fourteenth Amendment when the alleged constitutional violation involves testimony during a trial-like proceeding. *See Halsey v. Pfeiffer*, 750 F.3d 273, 291 (3d Cir. 2014) ("The boundary between Fourth Amendment and Fourteenth Amendment claims is, at its core, temporal. . . . [The Fourth Amendment's] protection against unlawful seizures extends only until trial. . . . The guarantee of due process of law, by contrast, is not so limited as it protects defendants during an entire criminal proceeding through and after trial."); *Pierce v. Gilchrist*, 359 F.3d 1279, 1285–86 (10th Cir. 2004) (noting in dicta, "[t]he initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause." (internal citation omitted)); *Gregory*, 444 F.3d at 750 ("Plaintiff alleges both that his detention was unlawfully continued due to [the state's forensic expert's] failure to disclose exculpatory evidence . . . and that his right to a fair trial was abridged. The situs of injury is distinct and therefore Plaintiff should be able to pursue both [Fourth Amendment and *Brady*-violation] theories.").

And the Court need not engage further in the challenging task of defining the boundaries between a Fourth and Fourteenth Amendment claim based on allegedly false testimony at a quasi-judicial proceeding. This is because Bailey has not established a premise of such a claim: that a reasonable jury could find that Lorenz's testimony was false. The following is the testimony in question:

> [HEARING OFFICER]. So Mr. Bailey was offered both the [preliminary breath test] and the regular breathalyzer, as well?
>
> [LORENZ]. That's correct, sir.
>
> Q. And he refused both?
>
> A. He refused both.

Q. All right. Was there indication that he was unclear or unsure as to why he needed to take a second test?

A. No. When I completed reading him his chemical test rights, his only response was to my question on will he take a breath test was not 'til I speak to an attorney.

Q. Okay. And what did you respond to that?

A. I don't recall what my response to that was. He made no further requests to speak to attorney after that point.

(Implied Consent Hr'g Tr. at 19–20.) The specific question asked by the hearing officer was whether Bailey was "unclear or unsure as to *why* he needed to take a second test." Although following his statement, "Not until I speak to my attorney," Bailey expressed not knowing *where* the test would be taken, he did not "indicat[e] that he was unclear or unsure as to why he needed to take a second test," which is what the hearing officer asked. Additionally, after reading the chemical test rights from the form, Lorenz asked Bailey only one question, "Will you take a breath test?," and Bailey specifically responded "Not until I speak to my attorney." It was then Bailey who, 20 seconds later, restarted dialogue with Lorenz and it was Bailey who asked Lorenz a question about where the test would be administered.

At most, a reasonable jury could find that Lorenz's testimony was incomplete. Lorenz did not testify to his and Bailey's exchange after Bailey's initial response. But Bailey has not persuaded the Court that this is a violation of constitutional dimension—a deprivation of the basic procedural fairness guaranteed by the Due Process Clause—where Bailey had the opportunity (and did) cross examine Lorenz and had the opportunity (and did) testify. Indeed, Bailey seems to fault Lorenz for not testifying to something that Bailey also did not testify to. Neither the hearing officer nor Bailey's counsel asked Lorenz whether he had additional discussions with Bailey about the chemical test after asking him if he would take it or whether

29

Bailey subsequently agreed to take it. Nor did Bailey offer any clarification when he testified.[2] Thus, to the extent Lorenz's testimony was incomplete, the Court finds, as a matter of law, no violation of the Due Process Clause.

Additionally, the Court agrees with Lorenz's argument, raised at the hearing, that he is absolutely immune from suit based on his implied-consent-hearing testimony. In *Briscoe v. LaHue*, the Supreme Court explained that Congress enacted 42 U.S.C. § 1983 against a backdrop of common-law immunities, and "[t]he immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established in English common law." 460 U.S. 325, 330–31 (1983). And it explained that "[w]hen a police officer appears as a witness, he may reasonably be viewed as acting like any other witness sworn to tell the truth—in which event he can make a strong claim to witness immunity; alternatively, he may be regarded as an official performing a critical role in the judicial process, in which event he may seek the benefit afforded to other governmental participants in the same proceeding." *Id.* at 336–37. The Supreme Court thus held that police officers were immune from suit based on the testimony they offered during a criminal trial. *See id.* at 326, 345–46.

Bailey distinguishes *Briscoe* by pointing out that Lorenz's testimony did not occur at a criminal trial. (Pl.'s Resp. at 32.) But absolute immunity does not only shield witnesses who testify at a criminal trial. The Supreme Court has "mentioned the following factors, among others, as characteristic of the judicial process and to be considered in determining absolute as contrasted with qualified immunity: (a) the need to assure that the individual can perform his

---

[2] At the oral argument, Bailey's counsel contended that, at the time of the implied-consent hearing, he and Bailey were confused about the difference between the chemical test and preliminary breath test. But this is belied by Bailey's deposition testimony that the reason he ultimately agreed to take the chemical test is because the "lightbulb went off" (in the squad car) that these were not the same tests.

functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal." *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985) (citing *Butz v. Economou*, 438 U.S. 478, 510 (1978)).

Here, the judicial-process factors tilt strongly in favor of recognizing the implied-consent hearing as one where a witness is entitled to testimonial immunity. The hearing officer was not a member of or otherwise beholden to the City of Howell's Police Department, *see* Mich. Comp. Laws § 257.625f(1), and Bailey does not suggest that the officer had any reason not to be objective and impartial. Bailey was able to introduce evidence and use the Secretary of State's processes for obtaining discovery. *See* Mich. Comp. Laws § 257.625f(2) ("The hearing officer may administer oaths, issue subpoenas for the attendance of necessary witnesses, and grant a reasonable request for an adjournment."). Bailey was represented by counsel. (Implied Consent Hr'g Tr. at 1.) Lorenz's testimony was given under penalty of perjury. *See* Mich. Comp. Laws § 257.625f(3) (providing that hearing officers had ability to administer oaths and "[p]unish for contempt any witness failing to appear or testify in the same manner as provided by the rules and practice in the circuit court"). Lorenz was subjected to cross examination. (Implied Consent Hr'g Tr. at 11.) The hearing officer provided written findings of fact and conclusions of law. (Pl.'s Resp. Ex. 11, Implied Consent Order.) *See also* Mich. Comp. Laws § 257.322(5). These findings were appealable to circuit court. Mich. Comp. Laws § 257.625f(6). With these procedural safeguards in place, the Court finds that the implied-consent hearing is the type of judicial proceeding where witnesses are entitled to absolute immunity. *Cf. Butz v. Economou*, 438 U.S. 478, 512–13 (1978) ("We think that adjudication within a federal administrative agency shares

enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages."); *Lewis v. Drouillard*, 704 F. Supp. 2d 673, 682 (E.D. Mich. 2010), *amended on denial of reconsideration*, No. 09-11059, 2010 WL 3464308 (E.D. Mich. Aug. 30, 2010) ("The Court finds that [Michigan's workers' compensation] hearings are the functional equivalent of judicial proceedings. The hearings themselves bear all the hallmarks of the judicial process: they are conducted by a magistrate who, like judges, serves in an adjudicative capacity only; the parties are represented by lawyers, and may call upon, and cross-examine, witnesses and experts; WCA determinations are subject to appeal and judicial review by the Michigan Court of Appeals or the Michigan Supreme Court.").[3]

In short, whether on a fair interpretation of the hearing transcript or via absolute immunity, Bailey's claim that Lorenz violated his constitutional due-process rights when he testified at the implied-consent hearing does not warrant a jury trial.

That leaves two bases for Bailey's due-process claim: that Lorenz falsely implied to Judge Geddis that Bailey had refused the chemical test and unjustifiably submitted a chemical-test-refusal form to the Secretary of State. Neither supports a due-process claim. For one, if

---

[3] At oral argument, Bailey argued that, at the implied-consent hearing, Lorenz was "not acting as a police officer any more [than he was] acting as a prosecutor." It may be that Lorenz had a vested interest in seeing that Bailey's license was suspended for refusing the chemical test, but Bailey offers no *legal* basis for concluding that this fact deprives Lorenz of witness immunity. *Cf. Rehberg v. Paulk*, --- U.S. ---, 132 S. Ct. 1497, 1507–08, 182 L. Ed. 2d 593 (2012) ("It is clear—and petitioner does not contend otherwise—that a complaining witness cannot be held liable for perjurious *trial* testimony. . . . By testifying before a grand jury, a law enforcement officer does not perform the function of applying for an arrest warrant; nor does such an officer make the critical decision to initiate a prosecution. It is of course true that a detective or case agent who has performed or supervised most of the investigative work in a case may serve as an important witness in the grand jury proceeding and may very much want the grand jury to return an indictment. But such a witness, unlike a complaining witness at common law, does not make the decision to press criminal charges.").

Lorenz acted wrongly on the night of Bailey's arrest by swearing to the warrant or completing the test-refusal form, his conduct was not predictable to the State, and Bailey had an adequate post-deprivation remedy via the implied-consent hearing. *See Parratt v. Taylor*, 451 U.S. 527, 541 (1981); *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). Second, under Michigan law, Bailey was entitled to a temporary license until the implied-consent-hearing. Mich. Comp. Laws § 257.625g(1). Indeed, Bailey alleges only that his driver's license was suspended for the eight months between the first and second administrative hearings. (*See* Pl.'s Resp. at 5, ¶¶ 15, 16.) As such, Lorenz's conduct during the night of the arrest did not deprive Bailey of a liberty interest for which the Due Process Clause guarantees process. *Cf. Bell v. Burson*, 402 U.S. 535, 539–42 (1971) (explaining that, because issued licenses may become essential "in the pursuit of a livelihood," the Due Process Clause requires both notice and a meaningful hearing "before the termination" of driving privileges).

## F.

In Count II, Bailey claims that, in violation of the Fourth Amendment, "Lorenz made an illegal traffic stop and made fraudulent and false statements to get a judge to sign off on a search warrant to search and seize Plaintiff's blood as well as seize Plaintiff's driver's license despite Plaintiff agreeing to take a chemical breath test on a Datamaster machine." (Am. Compl. ¶¶ 61–62; Pl.'s Resp. at 2, ¶ 5c.) Bailey's allegations about wrongful search of his body and seizure of his blood have been addressed. *See* Part II.C.

As for Bailey's claim that Lorenz seized his license in violation of the Fourth Amendment, in other circumstances the Court would not address the claim. This is because Lorenz has not moved to dismiss it. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing

33

the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976) ("Under Rule 56(c) the moving party always has the initial burden of showing the absence of a genuine issue of material fact and that he is entitled to judgment as a matter of law."). In this case, however, it happens that the foregoing analysis resolves Bailey's Fourth Amendment claim based on Lorenz's "seizure" of his driving privileges and license.

As noted, once Lorenz interpreted Bailey's answer, "Not until I speak to my attorney," as refusing his request to take a chemical test, Lorenz was required by Michigan law to suspend Bailey's license and issue him a temporary one. And, as discussed, Bailey has not pled that he did not receive a temporary license. As for Lorenz's allegedly false testimony at the implied-consent hearing, that too cannot state a Fourth Amendment violation for reasons provided in the context of addressing Bailey's due-process claim.

## G.

Finally, in Count VI, Bailey asks this Court to issue an injunction directing the City of Howell to move or remove the island median, or post appropriate signage, along the stretch of highway around the Shark Club's exit. (Pl.'s Resp. at 34–35.) Bailey has provided the Court with an aerial picture of the area with his proposed changes. (Pl.'s Resp. Ex. 26.)

The Court agrees with the City of Howell that Bailey, now as familiar with the highway running past the Shark Club's as any other, is highly unlikely to be again injured or misled by the median or lack of signage. (*See* Defs.' Mot. at 18–19). Bailey thus lacks standing to pursue prospective injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (providing

34

that to establish Article III standing, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'"); *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014) (providing that to establish the injury-in-fact element of standing, "[t]he 'threat' of a prospective injury must be real and immediate and not premised upon the existence of past injuries alone").

## IV.

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment (Dkt. 29). A separate judgment will be entered in favor of Defendants on all claims of the Amended Complaint (Dkt. 25).

SO ORDERED.


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  February 20, 2015


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 20, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson

35